UNITED STATES OF AMERICA

United States District Court

District Court of Massachusetts
Docket No.

DIAMOND BOONE, BURTON BOONE, and )
BABY DOE BOONE )
    Plaintiffs )
     )
    v. )
     )
ATHENA HEALTH CARE ASSOCIATES, INC. )
LAWRENCE SANTILLI, )
KRISTA SANTILLI GRACE, )
MARK NUGENT, DENNIS BILLINGS, and )
STUART ROSENBERG )
    Defendants )

## VERIFIED COMPLAINT AND JURY DEMAND

I.    **THE PARTIES**

1.    The Plaintiff, Diamond Boone, is an individual residing in Windham, Rockingham County, New Hampshire. She is the wife of the Plaintiff, Burton Boone and the mother of the Plaintiff, Baby Doe Boone.

2.    The Plaintiff, Burton Boone, is an individual residing in Windham, Rockingham County, New Hampshire. He is the husband of the Plaintiff, Diamond Boone and the father of the Plaintiff, Baby Doe Boone.

3.    The Plaintiff, Baby Doe Boone ("Baby Doe,") is an individual residing in Windham, Rockingham County, New Hampshire. She is the infant daughter of the Plaintiffs Diamond and Burton Boone. During most of the events at issue in the present matter, Baby Boone was in the womb of Diamond.

4.    The defendant Athena Health Care Associates, Inc. ("Athena,") is a Connecticut corporation with a principal place of business located at 135 South Road Suite 1, Farmington, CT,

06032. Athena is qualified as a foreign corporation to do business in Massachusetts with a principal place of business at C/O Murtha Cullina LLP, 33 Arch Street, 12th Floor, Boston, Massachusetts 02110.

5.      The Defendant Lawrence ("Larry") Santilli is an individual with a principal place of business at 135 South Road Suite 1, Farmington, CT, 06032. At all times relevant hereto, Lawrence Santilli was the chief executive officer of Athena, and maintained effective control of its operations.

6.      The defendant Krista Santilli Grace is an individual with a principal place of business at 135 South Road Suite 1, Farmington, CT, 06032. She, is the daughter of Larry Santilli and at all times relevant hereto was Chief Medical Officer of Athena.

7.      The defendant Stuart ("Stu") Rosenberg is an individual residing in Bristol, Connecticut and at all times relevant hereto was the Chief Administrator Officer of Athena.

8.      The defendant Mark Nugent is an individual residing in Newburyport, Massachusetts. At all times relevant hereto, he was the Licensed Nursing Home Administrator for Athena's Massachusetts and Rhode Island facilities.

9.      The defendant Dennis Billings is an individual residing in Southwick, Massachusetts. At all times relevant hereto, he was Athena's Regional Director of Operations for Massachusetts and Rhode Island under the authority of the National Healthcare Association.

II.     JURISDICTION OF THE MASSACHUSETTS DISTRICT COURT

10.     The Massachusetts District Court has jurisdiction of this matter because Diamond worked at an Athena facility located in Massachusetts nearly every business day during her four (4) years of employment at Athena.

11.    Even though as a resident of New Hampshire the "effects" of Diamond's injuries were suffered primarily in New Hampshire, jurisdiction of this matter in Massachusetts is proper because Massachusetts is the state where Diamond's injuries were sustained and all causes of action by all Plaintiffs herein arise out of such injuries.

12.    Because each of the following claims are based on each defendant's violation of one or more federal statutes, the Massachusetts District Court has federal question jurisdiction under (i) 28 U.S.C. § 1331 for Count I (FMLA); (ii) 42 U.S.C. §2000(e) et. seq. for Count II - (Title VII); and (iii) 29 U.S.C. §1001, ET. SEQ. for Count III (ERISA).

13.    The Massachusetts District Court has jurisdiction over the remainder of Plaintiffs" claims under 28 U.S.C. § 1367 by its authority to hear state claims supplemental to federal claims.

## III.    FACTS

14.    At all times relevant hereto, Athena has provided skilled nursing care, rehabilitation and short-term, post-hospital care at its health care facilities located in Connecticut, Massachusetts and Rhode Island.

15.    Upon information and belief, Athena operates its facilities on property it leases from real estate holding entities which are wholly owned and controlled by Larry Santilli.

16.    As referenced in "newsfromthestates.com/states/Connecticut" dated November 22, 2024, Athena employed a total of approximately two thousand five hundred (2,500) employees.

17.    At all times relevant hereto, the usual course of business for Athena to fill a job opening was to advertise the availability of the position on the ubiquitous website "Indeed.com," at the same time as advertising on established social media sites such as Linkedin and Facebook.

18.    Diamond was first made aware of Athena from seeing a posting for her job on the website "Indeed.com".

3

19.    Diamond was hired by Athena pursuant to an offer letter dated February 16, 2021 with the job title "Regional Specialist of Therapeutic Recreation Services for Athena Health Care Systems." Her initial salary was $1,961.54 weekly, annualized at $102,000 per year.

20.    Although the offer letter purports to come from an entity called "Athena Healthcare Systems, Inc.," no such corporation actually existed and upon information and belief, no such corporation *ever* existed.

21.    Although the offer letter stated "you will be subject to all applicable employment and other policies of the Company, **as outlined in the employee handbook** and elsewhere" [emphasis added], no such "employee handbook" was ever provided to Diamond.    Upon information and belief, Athena never prepared an "employee handbook" for their employees.

22.    The offer letter also stated: "Athena Health Care Systems offers a comprehensive benefit package, which includes health, dental, short-term disability, and life insurance with various contributions depending on the package you select."

23.    The health benefits offered by Athena to its employees required a significant contribution from the employees to Athena.    Athena was supposed to use those employee contributions, as well as its own contributions, to establish a fund from which the employees' claims for medical bills would be paid.

24.    Pursuant to the offer letter, Diamond selected the family health care plan, which included coverage for her (then) only child.

25.    As is relevant to the claims of Baby Boone herein, the birth of the first, second and third child of Diamond and Burt were routine and without complication.

26.     Pursuant to Diamond's election for the family health care plan, Athena withdrew approximately one thousand two hundred dollars ($1,200) per month from Diamond's paychecks for payment into Athena's self-insured pool of funds.

27.     Although Athena had an obligation to fund the insurance pool that provided Diamond and her children full coverage health insurance benefits, the funds paid by Diamond to Athena were not used to purchase insurance for her benefit.

28.     Upon information and belief, the funds paid by Diamond to Athena for the purchase of full coverage health insurance benefits were converted by Lawrence Santilli, or a person under his authority and control, for his own use and benefit.

29.     Upon information and belief, the funds paid by Diamond to Athena for the purchase of health insurance benefits and converted by Larry Santilli were paid to the landlords of the respective Athena operating facilities.

30.     The landlords of the Athena operating facilities are real estate holding companies owned entirely by Larry Santilli.

31.     At the time when Diamond was hired by Athena at a salary of $102,000 a year, another Director of Recreation was also hired at the same salary.

32.     Diamond and the other Director were assigned to oversee the residents' recreational activity programs at the following Athena facilities located in Massachusetts:

Athena Health Care Systems Massachusetts Division Haverhill, MA
Active Physical Therapy & Wellness - Wilbraham, MA
Berkshire Rehabilitation & Skilled Care Center - Sandisfield, MA
Cape Heritage Rehabilitation & Health Care Center, Sandwich, MA
Cape Regency Rehabilitation & Health Care Center, Centerville, MA
Highview of Northampton, Leeds, MA
Lanessa Extended Care, Webster, MA
Marlborough Hills Rehabilitation & Health Care Center, Marlborough, MA
Northwood Rehabilitation & Health Care Center, Lowell, MA

Parsons Hill Rehabilitation & Health Care Center Worcester. MA
Plymouth Rehabilitation & Health Care Center Plymouth, MA
Southbridge Rehabilitation & Health Care Center, Southbridge. MA
Southeast Rehabilitation & Skilled Care Center, North Easton, MA
South Shore Rehabilitation & Skilled Care Center Rockland, MA
The Oxford Rehabilitation & Health Care Center, Haverhill, MA
The Tremont Rehabilitation and Skilled Care Center, Wareham, MA
Webster Manor Rehabilitation & Health Care Center, Webster, MA
Worcester Rehabilitation & Health Care Center, Worcester, MA

33.    A woman named Natalie Mihalchick was the Director of Therapeutic Recreation for Athena's Connecticut facilities. She has no minor children and is past the age of child bearing.

34.    With few exceptions for days spent at Athena facilities in Rhode Island, Diamond's job responsibilities at Athena required her to physically spend each and every work day in Massachusetts at one of the Athena facilities above.

35.    To the best of Diamond's recollection, each of the facilities for which she was the Director contained a poster, an example of which is attached hereto as Exhibit "A." This poster contained a photograph of a woman named Maryann Thorp, Director of Employee Relations at Athena Health Care Systems, which stated "Your Comments and Concerns Matter to Us" (the "Maryann Thorp Poster.")

36.    The Maryann Thorp Poster did not mention *any* statutory protection to which employees are entitled under Massachusetts or federal law. Rather, the Maryann Thorp Poster simply advised any employee with a complaint to contact her at the number listed on the poster.

37.    None of the facilities in Massachusetts or Rhode Island where Diamond worked contained a poster that complied with the notice requirements of the Family and Medical Leave Act (FMLA) at 29 U.S.C. § 2619, which states:

> Each employer shall post and keep posted, in conspicuous places on the premises of the employer where notices to employees and applicants for employment are customarily posted, a notice, to be prepared or approved

by the Secretary, setting forth excerpts from, or summaries of, the pertinent provisions of this subchapter and information pertaining to the filing of a charge.

38.     None of the Athena facilities in Massachusetts or Rhode Island where Diamond worked contained a poster that complied with the notice requirements of 29 C.F.R. § 825.300 of the FMLA, which states:

> Every employer covered by the FMLA is required to post and keep posted on its premises, in conspicuous places where employees are employed, a notice explaining the Act's provisions and providing information concerning the procedures for filing complaints of violations of the Act with the Wage and Hour Division. The notice must be posted prominently where it can be readily seen by employees and applicants for employment.

39.     An example of the poster that Athena was required to post in each of its facilities may be obtained from the official Department of Labor website (herein the "FMLA Poster,"), and states in bold: **"Your Employee Rights Under the Family and Medical Leave Act."** A copy of the FMLA POSTER is attached hereto as Exhibit "B."

40.     The FMLA Poster alerted employees that their rights to pregnancy leave under the FMLA included "intermittent" time off to provide prenatal care, as well as the need for reasonable accommodations for relief of physical discomfort and emotional distress.

41.     However, because Athena failed to post the FMLA Posters as required by 29 U.S.C. § 2619 and 29 C.F.R. § 825.300, Diamond was unaware of the intermittent leave available to her under the FMLA. She was under the belief that FMLA was available to her only at such time as she was set to go on maternity leave, i.e., when she was about to deliver her expected child.

42.     Diamond's performance at the Company made her a rising star. Shortly before the events at issue, Diamond won the prestigious McKnight Rising Star Award which recognizes "women making their marks in skilled nursing, senior living and home care, inspiring others and

having a powerful effect on the lives of the individuals they serve." See https://www.mcknightswomenofdistinction.com.

43.     In or around January 2022, Diamond's Co-Director quit his job, leaving Diamond as the sole Regional Director for Massachusetts and Rhode Island.

44.     Rather than hire a replacement, Larry Santilli approached Diamond about acting as Director of all of these facilities. As compensation for such additional responsibilities, Diamond requested a raise from her $102,000 annualized salary, to $130,000.

45.     On January 24, 2022, in response to her request for a raise, Larry Santilli sent Diamond a text message: "By the way I have a surprise for you when you get your check next week. [A] little different than we talked about.   ☺"

46.     The "surprise" and the "☺" at the end of Larry Santilli's January 24, 2022 text message was a raise to $150,000, about fifteen percent (15%) more than the amount Diamond had requested. It was a gesture of good faith by Athena towards Diamond, and she strived her very best to return such good faith to the company.

47.     Diamond was unaware, however, that while Larry Santilli was giving her a raise on one hand, he was stealing her $1,2000 health insurance premium every month on the other  hand.

V.     DIAMOND'S FIRST TWO (2) REQUESTS FOR FMLA LEAVE FROM ATHENA

48.     Diamond's first request for FMLA leave from Athena in 2022 could not have gone more smoothly. This fact is evidenced by the following e-mail communications between Diamond and Heidi Young, head of human resources at Athena:

> E-mail dated June 30, 2022 at 1:34 PM from Diamond Boone to administration@worcesterrhcc.com RE: FMLA Paperwork: "Good Afternoon - I was wondering if I would need to fill out FMLA paperwork from Worcester Rehab? If so can you please email me the documents I would need to fill out? Thank you."

E-mail dated June 30, 2022 2:39 P.M. by Heidi Young, Worcester Rehab to Diamond Boone RE: FMLA Paperwork: "Hi Diamond - When will you be starting FMLA?"

E-mail dated June 30, 2022 at 2:51 PM from Diamond Boone to administration@worcesterrhcc.com "Friday, August 5th 2022 **for Maternity Leave.**" [Emphasis added].

E-mail dated June 30, 2022 2:55 P.M. by Heidi Young to Diamond Boone RE: FMLA Paperwork: "Great Congratulations!  I will work on your paperwork tomorrow and send it out to you then.  Thanks. Heidi"

49.    In or around October 24, 2023, the Massachusetts Department of Family and Medical Leave sent Diamond a Notice of Approval of her Application for paid FMLA leave for her third child – her second child while at Athena.  "Leave Type - Medical leave for pregnancy; Schedule - Continuous; Start Date – 11-27-2023; End Date 2-29-2024; The maximum preliminary benefit amount that you are eligible for is $1,129.82 Weekly."

50.    Diamond delivered her third child on November 15, 2023.  The delivery could not have gone more smoothly.

51.    The total cost in medical bills for prenatal care and delivery of Diamond and Burt's third child was approximately $30,000.

52.    When Diamond was presented by her health care provider with a bill for $10,000 for the birth of her third child, she referred it to the employee benefits administrator at Athena, Karen Dooley.  However, the bill remained unpaid for a period of over six (6) months.

53.    The remaining $16,975 bill for the birth of her third child was not sent to Diamond until January 29, 2025, shortly after the events at issue, and more than a year after the medical services were incurred.

54.    Despite the fact that Diamond contributed over $1,2000 per month to an Athena funded company health plan, this bill is currently in collections.

## ATHENA'S PRESIDENT & CEO LARRY SANTILLI "STEPPED DOWN"

55.     On March 2024 Athena published its monthly Athena and You Newsletter in which Larry Santilli announced he was stepping down as CEO of Athena Health Care Systems – the company that does not exist:

> Dear valued Athena Health Care Systems staff - I'm sure you have already received communication regarding my decision to step aside as C.E.O. of Athena . . . the best way for us to ensure this bright future is for me to make room for a new group of leaders to oversee the day-to-day operations of the company.

56.     Although Larry Santilli claimed he had stepped down as CEO of Athena, upon information and belief, he continued to maintain operational control of Athena through his daughter, Krista Santilli Grace.

57.     In or around April of 2024, Krista Santilli Grace took over the day to day operational control of Athena from her father, Larry Santilli. The authority of Krista Santilli Grace to direct and control Diamond's actions at Athena subsequent to March 2024 is depicted by an e-mail exchange on April 15-16, 2024, as follows:

> E-mail dated April 15, 2024 at 12:07 P.M. from Krista Grace to Diamond Boone, cc: Joe Silva Re: Touch Base
>
> > Hi Diamond! Hope all is well- I want to reach out and see if we can touch base sometime this week, I am excited to have you back from leave and would love to collaborate regarding recreational initiatives and projects for MA+RI! Would sometime Thursday work?
>
> E-mail dated April 15, 2024 at 1:35 P.M. by Diamond Boone to Krista Grace, cc: Joe Silva Re: Touch Base
>
> > Hi Krista! I would love to collaborate with you! I will be in Minnesota Thursday representing Athena Health Care Systems at the National Association of Activity Professionals Conference. I will be speaking about the

innovation and unique programming in our MA and RI homes. I will also be speaking on the diversity in programming that Athena has to offer. I can be available anytime after 1:00pm.

E-mail dated April 15, 2024 at 2:44 P.M. by Krista Grace to Diamond Boone, cc: Joe Silva Re: Touch Base

That's great Diamond! How long are you in Minnesota for? Can you share the media slides that you will be sharing with Joe and I on behalf of Athena? Let's chat Tuesday or Wednesday then?

E-mail dated April 15, 2024 at 3:28 P.M. by Diamond Boone to Krista Grace, cc: Joe Silva Re: Touch Base

Thank you! - I will be sharing/ discussing the programs we do in MA and RI homes through a document that Savannah put together for me. I will also be sharing pictures slides of the programs that we do. I'm taking all the pictures from FB because those residents that are on FB have a consent. I'm especially highlighting the community re-entry vocational program that I developed at Worcester Rehab. My plan is to discuss the programs that we offer as the PPT slideshow is presented to the audience  I will be done with the picture ppt slideshow by Wednesday morning. Can I share it with you then?

I will be in Minnesota at the conference from Wed-Friday. Tomorrow I will be at Northwood. Would you have time to discuss tomorrow at 1:30pm or any time after that?  Thank you!

E-mail dated April 15, 2024 at 6:36 P.M. by Krista Grace to Diamond Boone, cc: Joe Silva Re: Touch Base

Amazing! Excited to have you share the great services you and Athena are providing to our residents. Let's touch base briefly tomorrow, would around 230pm be ok? We can do a phone call

E-mail dated April 15, 2024 at 7:00 P.M. by Diamond Boone to Krista Grace, cc: Joe Silva Re: Touch Base

Yes, that works! Tomorrow at 2:30pm Thank you!

11

E-mail dated April 16, 2024 at 11:47 A.M. by Krista Grace to Diamond Boone, cc: Joe Silva, Judy Hyland Re: <u>Touch Base</u>

> Thanks Diamond I will set up a meeting invite. This looks like a really nice conference - did you share this plan with Joe who is over the Massachusetts facilities regarding approval? We would need your presentation prior to the event as you are going as a representative of Athena

E-mail dated April 16, 2024 at 11:25 A.M. by Diamond Boone to Krista Grace, cc: Joe Silva, Judy Hyland Re: <u>Touch Base</u>

> Thank you, in regard to the final slideshow ppt, I can get it to you by today! I did not mention this to Joe. Moving forward, do I report to Joe as my direct supervisor?
>
> I'm also being honored as a Rising Star honoree McKnight's Women of Distinction Honoree 2024 – McKnight's Senior Living News: https://www.mcknightswomenofdistinction.com/ On May 14th, 2024, on this day I will be going to Chicago for the ceremony. I did let Savannah know about this as there will be news reporters there looking for comments from me in regard to what I have done at Athena. I will keep Joe in the loop moving forward in regard to media and conference engagements that I'm involved in. thank you!

58.     Based on the above, there was clearly "a new sheriff in town" – Larry Santilli's daughter – Krista Santilli Grace.

59.     In or around August 2024, Krista Santilli Grace installed new bosses over Diamond when Mark Nugent and Dennis Billings became her immediate supervisors who both possessed the power and authority to terminate her.

60.     The gaining of supervisory authority over Diamond by Dennis Billings and Mark Nugent is supported by a certain exchange of e-mails dated August 2024 in which they instruct Diamond to report to them on a weekly basis.

<u>THE DISCRIMINATION AGAINST DIAMOND BECAUSE OF PREGNANCY</u>

61.     In or around August 2024, Diamond became pregnant with her fourth (4th) child.

62.    In contrast to the ease of taking leave for her first two (2) pregnancies under the direction of Heidi Young in human resources, Diamond's third pregnancy while at Athena could not have been more stressful to Diamond, Burt and Baby Boone than they possibly imagined.

63.    Diamond had yet to discover that the withdrawals from her paycheck each month for her family's health insurance were being converted by Larry Santilli to his own use and benefit.

64.    The facts surrounding Larry Santilli's conversion of payments from employees such as Diamond to Athena's healthcare fund are more fully disclosed in certain litigation in the Iowa District Court for Polk County entitled <u>Claimdoc, LLC v. Athena Health Care Associates, Inc. et. al.</u> Case 1:22-cv-00012-RP-SBJ (August 2022). See Exhibit "D" - Claimdoc Complaint.

65.    As set forth in the Claimdoc Complaint, one of Larry Santilli's standard business practices was to underfund the employee health care pool, then, after failing to pay the health care providers for a certain number of months, require the healthcare provider to resubmit the bill and recommence the payment process from the beginning.

66.    Such unfair business practice explains why Diamond received a $16,975 bill from her health care provider for delivery of her third child that was over a year after she gave birth.

67.    In the meantime, at all times relevant hereto, Diamond paid nearly $50,000 in healthcare contributions over the length of her employment at Athena, which was largely stolen by Larry Santilli or a person under his authority and control.

68.    Therefore, since Diamond's pregnancy would cost Athena another $30,000 in unfunded medical bills, her continued employment at Athena presented a significant expense that the company would be liable to pay. This fact was confirmed on September 19, 2024, when Larry Santilli put forth the following letter addressed to *all* of Athena's 2,500 employees – RE: <u>Update on Health Insurance</u> – To Valued Employees:

In our last update in November 2023, we informed you of a significant funding shortfall in our employer-provided health insurance plan. Athena has not been able to promptly meet the funding requirements of the employee health plan. **As a result, we are approximately $17 million dollars behind in paying submitted health claims for all of our facilities.** Athena has put a robust plan in place to accelerate payments to providers, however this will take time. The timetable of paying 100% of outstanding medical claims is unknown. [Emphasis added].

69.     Diamond had a difficult time conceiving that Athena could act in such bad faith, if for no other reason than her pregnancy was starting to cause her severe pain and nausea. Her condition substantially limited her activities of daily life, including her ability to sleep, communicate and concentrate. The symptoms she experienced included dizziness, morning sickness and severe headaches.

70.     On September 30, 2024, Krista Santilli Grace e-mailed Diamond to advise her that she was being assigned to report daily to the Athena facility in Webster, Massachusetts known as "Lanessa." The Lanessa facility is more than eighty (80) miles each direction from Diamond's residence in Windham, New Hampshire.

71.     On October 1, 2024 at 10:08 A.M., Diamond sent the following e-mail to Mark Nugent, Dennis Billings and Heidi Young, with a "courtesy copy" ("cc.") to Krista Santilli Grace:

> Good Afternoon everyone. I wanted to [let] you all [know] – I'm expecting, and I'm about 2 months pregnant.
>
> Mark and Dennis: would it be possible for me to leave Lanessa tomorrow, 10/2, by 1:00 PM? I have an OBGYN appointment in New Hampshire that I need to attend. I'm happy to make up the lost hours on Thursday and Friday of this week. Please let me know. Additionally, I do have a couple of accommodations from my OBGYN that will be necessary for this pregnancy. I will send over the letter from my doctor via email after my appointment tomorrow . . . Hedi - **Could you please remind me what I need to provide for FMLA purposes?** Thank you all for your understanding and support. Best regards, [Emphasis added].

72.    As of October 1, 2024, Diamond had worked for Athena more than twelve (12) months; and (ii) had worked for Athena for at least 1,250 hours of service during the previous twelve (12) month period.

73.    As of October 1, 2024, Diamond was protected by the FMLA, which states at 29 C.F.R. § 825.120(a)(4): "Eligible employees are entitled to FMLA leave for pregnancy . . .."

74.    Under 29 C.F.R. § 825.300(b), within five (5) days of October 1, 2024 when Diamond notified her supervisors and Krista Santilli Grace of her pregnancy and the need for reasonable accommodations, Athena was obligated to provide her with an "**Eligibility notice**" advising her of her eligibility for FMLA leave.

75.    Within five (5) days of October 1, 2024 when Diamond notified her supervisors and Krista Santilli Grace of her pregnancy and the need for reasonable accommodations, Athena was obligated to provide her with a "**Designation notice**" advising her of her eligibility for FMLA leave under 29 C.F.R § 825.300(d), which states as follows:

> Designation notice - (1) The employer is responsible in all circumstances for designating leave as FMLA-qualifying, and for giving notice of the designation to the employee as provided in this section. When the employer has enough information to determine whether the leave is being taken for a FMLA-qualifying reason . . . the employer must notify the employee whether the leave will be designated and will be counted as FMLA leave **within five (5) business days** absent extenuating circumstance . . . If the employer determines that the leave will not be designated as FMLA-qualifying (e.g., if the leave is not for a reason covered by FMLA or the FMLA leave entitlement has been exhausted), the employer must notify the employee of that determination. [Emphasis added].

76.    As of October 1, 2024, when Diamond notified both of her supervisors and Krista Santilli Grace of her pregnancy and the need for reasonable accommodations, Athena was obligated to provide Diamond a notice advising her of her rights under M.G.L. c. 151B § 4(d)(ii):

Written notice of the right to be free from discrimination in relation to pregnancy or a condition related to her pregnancy . . . including the right to reasonable accommodations for conditions related to pregnancy . . . shall be distributed by an employer to its employees. **The notice shall be provided . . . to an employee who notifies the employer of a pregnancy**. [Emphasis added].

77.    As of October 1, 2024, Athena was obligated under M.G.L. c. 151B § 4(c) to engage in interactive dialog with Diamond regarding her need for reasonable accommodations in connection with her pregnancy, such as time off for prenatal care, plus a temporary reassignment to one of the several Athena facilities closer to her New Hampshire home.

78.    As of October 1, 2024, Athena was obligated under The Pregnant Workers Fairness Act (42 U.S.C. § 2000gg et. seq.) to engage in interactive dialog with Diamond regarding her need for reasonable accommodations in connection with her pregnancy, such as time off for prenatal care, plus temporary reassignment to one of many Athena facilities closer to her home.

79.    Although Diamond's October 1, 2024 e-mail advising she was two (2) months pregnant was addressed to her bosses Mark Nugent and Dennis Billings, neither of them replied. Instead, Krista Santilli Grace took charge about three (3) hours later, stating:

> Congratulations on your pregnancy! Regarding FMLA- please reach out to Kathryn McAdoo who is **our FMLA and Leave Expert if you are in need of intermittent FMLA** to set up ASAP. I will CC Mary Prouty as well to help provide any additional support you need regarding understanding FMLA-related hours, PTO and sick time policies. Looking forward to chatting tomorrow [Emphasis added].

80.    By referring Diamond to the new "FMLA expert," Krista Santilli Grace admitted Diamond was subject to the benefits and protections of the FMLA.

81.    Until she received the above e-mail from Krista Santilli Grace, Diamond was not aware that Athena had hired an "FMLA expert" to take over Heidi Young's responsibility for administering FMLA leave.

16

82.    Critically, however, this leave was not maternity leave, which is defined in Form WH-380-E as being: "The birth of a child, or placement of a child with you for adoption or foster care, and to bond with the newborn or newly-placed child." Rather, such leave for prenatal care is classified under the FMLA as a "serious health condition of the employee."

83.    Because such leave is not to give birth but rather to provide prenatal support to the expected child, such leave is called "intermittent leave." In her past two (2) pregnancies at Athena, Diamond attended her prenatal doctors' appointments by simply using one of the numerous sick days she had accumulated. She *never* took "intermittent leave."

84.    To the extent Krista Santilli Grace intended for Diamond's time off for prenatal care to count towards her twelve (12) weeks of FMLA leave, Athena was *first* obligated by 29 C.F.R. § 825.300(c) to send Diamond a notice of "Rights and Responsibilities" that informed her that if she did not provide the proper medical certification within the time periods proscribed by FMLA, she would forfeit her right to FMLA leave.

85.    On October 1, 2024 at 1:49 P.M., Diamond received an e-mail from the FMLA expert - Kathryn McAdoo – the subject line of which stated: "Medical Certification and MA PFML Importance: High –:

> Hi Diamond - Congratulation (sic) on the pregnancy! So exciting! Just a quick question, I know you may need intermittent FMLA, do you plan to use MA Paid Leave to supplement your time? If so I have attached the flyer for MA PFML to get you started on that process. I have also attached a medical certification [Attachment Form WH-380 E] for your doctor to fill out and send back to us to approve an intermittent FMLA through the company. Let us know if there are any questions ☺

86.    Critically, despite the hiring of an FMLA and Leave Expert:

(i)    none of Athena's facilities contained the federally mandated FMLA Poster alerting the employee to his or her respective FMLA rights;

    (ii)    Athena never sent Diamond the mandatory Eligibility Notice required by 29 C.F.R. § 825.300(b) within five days of October 1, 2024;

    (iii)    Athena never sent Diamond the mandatory notice required by M.G.L. c. 151B, § 4(d)(ii);

87.    In addition, despite the hiring by Athena of an FMLA and Leave Expert, Diamond was unaware that Athena had changed its policy regarding FMLA leave and required sick time in connection with her pregnancy to be treated as "intermittent leave" under the FMLA.

88.    As described below, Krista Santilli Grace would use the fact that Diamond did not understand Athena's "new" FMLA leave procedure as a weapon against her, because despite Athena having an FMLA and Leave "expert," none of the laws regarding "FMLA and Leave" were ever communicated to Diamond. Indeed, based on the facts below, it was as if Athena hired an "anti" FMLA and Leave Expert in order to discourage Diamond from taking FMLA leave.

89.    On October 2, 2024 Diamond went to see her OBGYN doctor in New Hampshire. The doctor's notes state as follows:

> She had been having some nausea but this has improved. She is mostly just exhausted. She has been taking Vitamin B6 daily, she is unsure of the amount. She works as an administrator in nursing homes . . . and does a lot of traveling. She mentions that her lower abdomen is sore after driving in the car for a long period of time. **She is wondering about a note that says she does not need to travel far. We discussed that this should be worked out with her employer.** [Emphasis added].

90.    The reference by Diamond's OBGYN to the need to discuss reasonable accommodations "with her employer," relates to M.G.L. c. 151B:4.1E, which states:

Upon request for an accommodation from the employee or prospective employee capable of performing the essential functions of the position involved, the employee or prospective employee and the employer shall engage in a timely, good faith and interactive process to determine an effective, reasonable accommodation to enable the employee . . . to perform the essential functions of the employee's job.

91.    The Pregnant Workers Fairness Act (42 U.S.C. § 2000gg et. seq.) also requires Athena to provide reasonable accommodations to a qualified employee's "known limitations related to, affected by, or arising out of pregnancy."

92.    On or about October 3, 2024, Krista Santilli Grace initiated a phone call with Diamond for the purpose of entering into an interactive dialog regarding her request for reasonable accommodations to alleviate the pain and stress on her abdomen and thus alleviate the jeopardy to her expected child. Mark Nugent was also on the call.

93.    During the interactive dialog with Krista Santilli Grace, Diamond disclosed that because of her pregnancy, the responsibilities of her job as the Massachusetts and Rhode Island Regional Director, which requires her to traverse virtually the entire Commonwealth of Massachusetts, was placing significant pressure on her abdomen and causing her severe pain.

94.    The pain in her abdomen also made Diamond anxious that such prolonged positioning could adversely impact the health of her expected child.

95.    Since the job requirement that she drive such long distances caused her severe pain and discomfort and jeopardized the health of her expected child, Diamond requested that she be temporarily assigned to work at an Athena facility closer to her home.

96.    As Chief Medical Officer of Athena, Krista Santilli Grace was aware of the jeopardy to the health of both Diamond and her expected child caused by the extensive pressure of such prolonged positioning during a one hundred sixty (160) mile commute each day.

97.    Instead of granting Diamond reasonable accommodation by temporarily reassigning her to one of the many Athena facilities closer to her home, Krista Santilli Grace advised Diamond to simply pull over on the side of the road and rest in her car if she became nauseous during her long drives to and from work each day.  Krista Santilli Grace advised Diamond she could report back after trying it out.

98.    Based on the rapid-fire events described below, such straight-faced refusal by Krista Santilli Grace to grant Diamond reasonable accommodations reflects her foreknowledge that no such accommodations would be required, because she planned to terminate Diamond's employment at Athena, regardless of the protection Diamond was afforded as a pregnant woman under FMLA (both state and federal), Title VII, the ADA and M.G.L. c. 151B.

99.    As instructed by the FMLA and Leave Expert - Kathryn McAdoo - on October 13, 2024, Diamond visited her OBGYN for purposes of getting approval for FMLA leave.  This request for FMLA leave just two (2) months into her pregnancy was different from Diamond's prior two (2) requests to Heidi Young in Human Resources, who advised Diamond each time that the choice of a date to go on FMLA leave was hers, not the company's.  Each of the prior twelve (12) week blocs of leave taken by Diamond began on a date that was just before she gave birth and was therefore considered "maternity leave."

100.    Diamond did not understand why Krista Santilli Grace advised her to contact the FMLA "expert" who, unlike Heidi Young in human resources, would require a doctor's certification at this early stage of her pregnancy.

101.    The reason why Krista Santilli Grace told Diamond to seek out the FMLA "expert" was because she intended to fire Diamond, then *immediately* deny Diamond her FMLA leave.

102.    The ultimate goal of Krista Santilli Grace was to terminate Diamond without Athena having to pay the unfunded $30,000 in expected medical costs associated with her pregnancy as well as the healthcare of her (soon to be) four (4) young children.   In the event that Diamond would assert her FMLA rights, the record would have to show that she was denied her FMLA rights because of her own failure to timely provide the required medical certification.

103.    Pursuant to Krista Santilli Grace's scheme, if Athena could demonstrate a failure to provide the necessary FMLA paperwork, then despite her pregnancy, Athena would *appear* to have been justified in denying Diamond her FMLA rights.

104.    If Diamond was terminated during her pregnancy yet could not claim FMLA protection *and* did not have insurance to cover the childbirth, such dire financial condition would make it easier to coerce Diamond to release her claims against Athena.

105.    To accomplish this scheme, Krista Santilli Grace required the coordinated actions of Diamond's immediate bosses, Mark Nugent and Dennis Billings, to execute Diamond's termination and place her in a financially desperate situation at a time when her pregnancy required significant outlays in uncovered medical bills.

106.    With Mark Nugent and Dennis Billings having set Diamond up with such coercive force, Krista Santilli Grace then required the coordinated action of Athena's Chief Administrator Officer - Stu Rosenberg, to ensure that Diamond signed the Release and Separation Agreement.

107.    The coordinated actions of Krista Santilli Grace, Mark Nugent, Dennis Billings and Stu Rosenberg were intended to accomplish the replacement of Diamond - whose continued employment would cost Athena an extra $30,000 in medical costs - with Natalie Mihalchick, who is past the age of child bearing; thus Athena would not incur this extra $30,000 in medical costs.

108. To accomplish this replacement of Diamond with Natalie Mihalchick at a time when Diamond was pregnant and therefore subject to the protections of federal and State law, Krista Santilli Grace, Mark Nugent, Dennis Billings and Stu Rosenberg conspired to create a pretext that involved the sudden combination of both Natalie's and Diamond's job responsibilities.

109. Under this narrative, both Diamond and Natalie would fight it out for the new job. Under such a narrative, the elimination of Diamond's job while she was pregnant would provide Athena the "cover" that her termination was just part of Athena's normal business operations and not related to any discrimination against Diamond because she was pregnant.

110. To prevent Diamond from asserting any possible claim under the FMLA that she was fired at a time when she was protected from termination because of her pregnancy, part of the coordinated actions required to accomplish the replacement of Diamond with Natalie was to fraudulently deny Diamond her FMLA rights at the precise same time when she was terminated. Since Diamond would be terminated at the precise same time when her FMLA rights were denied, she would be unable to appeal the denial of her FMLA rights.

111. As set forth extensively above, however, Athena was the party that failed to provide Diamond the required (i) FMLA Poster; (ii) the Designation Notice; and (iii) the Notice of Rights and Responsibilities and the Notice of protection under M.G.L. c. 151B § 4(d)(ii).

112. Moreover, because of the failure by Athena to provide its employees the statutory and regulatory notices described above, Diamond was unaware that the FMLA included something called "intermittent leave." Diamond believed that Krista Santilli Grace was referring to "maternity" leave, which Diamond found odd since she was only two (2) months pregnant.

113. On October 13, 2024, because Diamond was unaware that her request for time off for doctors' appointments was actually a request for "intermittent leave" under FMLA, she told

22

her OBGYN that the Form WH-380-E from Kathryn McAdoo was for maternity leave. Indeed, the form later provided by the FMLA expert stated that Diamond's request for FMLA leave was for maternity leave. See ¶ 122, below.

114.    The Doctor did not sign the Form WH-380-E because it was too early in Diamond's pregnancy to take full maternity leave, i.e., to take time off for the "birth of a child.".

115.    On October 30, 2024, Kathryn McAdoo e-mailed Diamond.  Whereas Kathryn McAdoo's first e-mail to Diamond did not include a "cc" to Krista Santilli Grace, this e-mail *did* include such a "cc" to Krista Santilli Grace with the subject line: Medical Certification and MA PFML. The e-mail stated: "Hi Diamond - Just reaching out to see if you have any questions or concerns? Did you ever have your physician complete the med cert? Let us know ☺"

116.    By e-mail that same day on October 30, 2024, Diamond replied to Kathryn McAdoo with a "cc" to Krista Santilli Grace "Good Afternoon - My OBGYN mentioned that she signs that paperwork closer to when I go on Maternity Leave in April 2025."

117.    If Krista Santilli Grace and the FMLA and Leave Expert - Kathryn McAdoo - were acting with honesty and integrity, they would have advised Diamond that the medical certification was not for maternity leave, but for intermittent leave.  Accordingly, Diamond merely required a statement from her OBGYN that she is pregnant and in need of prenatal care.  The medical certification did not require the doctor to state that Diamond is about to deliver her child.

118.    Due to the failures of Athena and its so-called FMLA and Leave Expert to perform their mandatory obligations to notify Diamond about her FMLA rights, Diamond was clearly under the mistaken belief as to the nature of the FMLA leave she was requesting.

119.    As FMLA and Leave Expert at Athena, Kathryn McAdoo was aware that Diamond was under the mistaken impression as to the nature of the FMLA leave she was requesting.

120.    Instead of advising Diamond honestly about her FMLA rights, Kathryn McAdoo replied by e-mail to Diamond with a "cc" to Krista Santilli Grace RE: <u>Medical Certification and MA PFML</u> "No worries! Just wanted to make sure all was well, let us know if you need anything before then ☺"

121.    As described below, Diamond had no further contact with Kathryn McAdoo, until literally minutes after she was terminated by her two (2) immediate bosses – Mark Nugent and Dennis Billings.

122.    The Designation Notice [attached hereto as Exhibit "E"] was sent to Diamond by the FMLA and Leave Expert - Kathryn McAdoo - and denied Diamond's FMLA rights states as follows:

> From: Athena Healthcare Date:        11/11/2024 To: Diamond Boone . . . on 10/01/2024, we received your most recent information to support your need for leave due to:
>
> > **X The birth of a child,** or placement of a child with you for adoption or foster care, and to bond with the newborn or newly-placed child [Emphasis added].
> >
> > Your        own        serious        health        condition The serious health condition of your spouse, child, or parent
> >
> > A qualifying exigency arising out of the fact that your spouse, child, or parent is on covered active duty or has been notified of an impending call or order to covered active duty with the Armed Forces
> >
> > A serious injury or illness of a covered servicemember where you are the servicemember's spouse, child, parent, or next of kin *(Military Caregiver Leave)*
> >
> > We have reviewed information related to your need for leave under the FMLA along with any supporting documentation provided and decided that your FMLA leave request is: *(Select as appropriate)*

Approved. All leave taken for this reason will be designated as FMLA leave. Go to Section Ill for more information. **X Not Approved** [Emphasis added].

The FMLA does not apply to your leave request.

As of the date the leave is to start, you do not have any FMLA leave available to use. **X Other: med cert never submitted by due date** [Emphasis added].

**As of 11/11/2024, you qualify for the following time**: **Are not eligible for state leave** Used: 0 weeks Available: 12 weeks First day of leave:  HR INFO - HR Representative managing this request: Kathryn McAdoo for questions pertaining to this leave request please contact: Contact Name: Kathryn McAdoo Contact's Information: fmla@Athenahealthcare.com [Emphasis added].

123.    The purpose of the deception in the Designation Notice was to provide a record for Athena to claim that *despite* Diamond's serious health condition due to her pregnancy, she was not eligible for FMLA leave because she failed to provide the required certification.

124.    This denial sent by the FMLA and Leave Expert - Kathryn McAdoo - occurred on the morning of November 11, 2024, when Diamond attended a Veterans Day event to honor her husband Burton's service in the military.  Diamond used a sick day and notified both Mark Nugent and Dennis Billings to say she was sick.

125.    Although she was on "sick leave," on November 11, 2024 at 10:01 A.M., Diamond received an e-mail from Mark Nugent instructing her to attend a Zoom meeting at 11:00 A.M.

126.    On November 11, 2024 at 11:00 A.M. Diamond attended the Zoom meeting with Mark Nugent and Dennis Billings from within her car parked at the Veterans Day celebration.

127.    Mark Nugent was blunt and forthright.  He stated in no uncertain terms that Athena is "getting rid" of Diamond's position.  He stated that Athena will be having one (1) Regional Director cover all of Massachusetts, Connecticut and Rhode Island.

128.    Mark Nugent also stated that although Athena is getting rid of Diamond's position, he had good news. He advised Diamond she could apply for the new position stating, "I think that you will be a great candidate for the position."

129.    Diamond replied by asking *when* the termination would occur, and Mark Nugent replied it was effective immediately. When Diamond asked for confirmation that she was not to report to the Worcester facility the next day, Mark Nugent confirmed that was correct.

130.    As per the instructions from Mark Nugent not to report to her assignment in Worcester, Diamond did not report to work during the week November 11 – November 19, 2024.

131.    One problem the defendants recognized, however, was that in terminating a pregnant employee such as Diamond, they were clearly violating the FMLA as well as other federal and state laws. Therefore, the defendants conceived a scheme to deny Diamond her protected rights to coerce her to sign a "Release and Separation Agreement" releasing all potential FMLA and other employment related claims against Athena and the individuals working for it.

132.    On November 11, 2024 at 11:46 A.M., the FMLA and Leave expert - Kathryn McAdoo - sent Diamond the e-mail referenced at ¶ 121, in which Athena denied her FMLA leave.

133.    It is a logical inference that the timing of the denial of Diamond's FMLA leave literally just minutes after she was terminated by Athena was not a coincidence.

134.    Evidence that the denial of Diamond's FMLA benefits was directly tied to her termination from Athena is found in the modified Form No. WH-381-E filled out by Kathryn McAdoo, which did *not* identify Diamond's FMLA leave as "intermittent leave" for prenatal care, but rather as "maternity leave" for giving birth to a child.

135.    Clearly, where the FMLA and Leave expert - Kathryn McAdoo – identified the "leave" requested by Diamond as being "maternity leave," *not* "intermittent leave," Diamond's

request for maternity leave at two (2) months pregnant *appeared* to be out of the ordinary and even deceptive on Diamond's part. This purported deception was reinforced by the FMLA and Leave expert - Kathryn McAdoo - where the purported reason for denial of Diamond's request for FMLA stated "medical certificate never provided."

136.    Notwithstanding the foregoing, it was the FMLA and Leave Expert - Kathryn McAdoo - who never provided a bona fide WH-381-E to Diamond that would have advised her OBGYN that the certification merely required that Diamond was pregnant, not about to deliver.

137.    Had the FMLA and Leave Expert - Kathryn McAdoo - complied with the obligations imposed on Athena under the FMLA, Diamond *would* have known she did not need to request her OBGYN to certify her "maternity" leave but rather to certify she needs "intermittent" leave for prenatal care.

138.    The clear purpose of Kathryn McAdoo's deception regarding filling out the modified Form No. WH-381-E was to provide a record for Athena to claim that despite Diamond's serious health condition due to her pregnancy, she was not eligible for FMLA leave because she failed to provide the required certification.

139.    By denying Diamond leave under FMLA, Krista Santilli Grace planned to use her lack of protected status to coerce Diamond to sign a Release and Separation Agreement releasing Athena from its clearly discriminatory actions in exchange for a meager severance package.

140.    The next day, on November 12, 2024, Stu Rosenberg called Diamond. This was the first time that Diamond had ever spoken to him.

141.    Stu Rosenberg acknowledged that Diamond's job covering the region of Massachusetts and Rhode Island was being combined with Natalie's job covering the region of Connecticut. He said "**one of you will get the job.**" He informed Diamond that if she does not

get the job there could be another job in the Athena corporate structure for her. Much of the conversation, however, focused on there *not* being another comparable job for Diamond at Athena, so the focus was largely on her severance payment if/when she does not get the job.

142.    During this conversation, Stu Rosenberg advised Diamond that her interview would be handled by Mark Nugent and Dennis Billings, but that Krista Santilli Grace was also involved in the decision-making process and may participate in the interview.

143.    Notwithstanding that the interview process was itself a result of pregnancy discrimination and was rigged in favor of Natalie, Diamond was confident that her superior work performance, as well as the extensive recognition by her peers, gave her a great advantage over Natalie. Although Diamond was discouraged, she was nonetheless determined to keep her job.

144.    Having been advised by Mark Nugent that her position would be "posted" and she could apply to get her position back, Diamond naturally searched on the Indeed, Facebook and Linkedin websites where Athena typically posts job openings. After several days of searching, however, she did not see her job posted on *any* of these websites.

145.    Finally, on November 18, 2024, which date was one (1) week after she had been terminated by Mark Nugent and Dennis Billings, Diamond finally saw her job posted on Athena's own website. On that same date - November 18, 2024 - Diamond sent an e-mail application to Athena for her own job that had just been eliminated.

146.    Unlike the standard protocol for posting of job openings at Athena which are posted on Indeed.com and social media sites such as LinkedIn and Facebook, the posting of Diamond's job only on Athena's corporate website significantly limited the number of potential job applicants. To prove this point, consider that when Diamond herself first applied for this same job at Athena, it was because she saw it posted on Indeed.com.

147.    Clearly, the true reason why Athena posted Diamond's job on its own website was not to attract potential job applicants. Rather the purpose of posting Diamond's job on Athena's own website was to prop up the conspirators' false narrative that Diamond's job was being eliminated as part of Athena's routine business operations.

148.    The next day - November 19, 2024 - Stu Rosenberg sent Diamond a text message "Hi Diamond – please call me RE: questions about last week. Thanks. Stu"

149.    The phone conversation between Diamond and Stu Rosenberg on November 19, 2024 was truly bizarre. During the conversation, Stu Rosenberg told Diamond that her job was not supposed to be eliminated immediately, and that she was not supposed to have been out of work for the past week. Stu Rosenberg told Diamond she could continue to work until a decision is made about who gets the new job. Notwithstanding such word salad by Stu Rosenberg, it is difficult to conceive how Diamond would have to apply for a job if she still had a job.

150.    During this conversation, Stu Rosenberg informed Diamond that Athena's elimination of her position was *not* the result of a "structured" downsizing of the company. Rather, he described the actions of Mark Nugent and Dennis Billings terminating her employment as "just telling you they were posting a regional job . . . you can apply - if you're not interested let us know."

151.    Stu Rosenberg did not tell Diamond that he was simply following a script to make it *appear* that her discharge from Athena was routine and unconnected to her pregnancy.

152.    On November 20, 2024, Diamond returned to work at the Worcester Rehabilitation facility. After having told her colleagues that she had been terminated, Diamond suffered the humiliation of announcing that she returned to Athena but might get terminated again.

153.     About three (3) weeks after returning to work, Stu Rosenberg and Mark Nugent held a Zoom meeting with Diamond and informed her that she did not get the new position.

154.     Mark Nugent started out the conversation by claiming that he had conducted interviews of several strong candidates, and even recited the background of one of these unidentified yet "qualified" candidates.

155.     The individual Defendants Mark Nugent and Stu Rosenberg were thus caught in a straight-faced lie about the essential nature of the elimination of Diamond's position.  Stu Rosenberg said the choice was between Diamond and Natalie, whereas Mark Nugent said the job was subject to open application. Those two (2) statements are irreconcilably at odds.

156.     This conundrum, however, is resolved by the conclusion that when Mark Nugent told Diamond he had interviewed other qualified candidates for the job, he was straight-faced lying to her.  Indeed, how could Mark Nugent interview applicants for the job when Athena did not advertise the availability of the position and the decision, according to Stu Rosenberg, was only between Diamond and Natalie?

157.     The whole exercise was just a pretext by the defendants to eliminate Diamond before Athena would have to incur any medical bills in connection with her pregnancy.  This bold allegation is supported by the following coordinated actions described above by the defefendants, recounted as follows:

     (i)     Krista Santilli Grace denied Diamond reasonable accommodations;

     (ii)    Mark Nugent and Dennis Billings terminated Diamond while she was pregnant;

     (iii)   Given her authority over Diamond, the decision to terminate Diamond arose with Krista Santilli Grace;

     (iv)   Krista Santilli Grace deceptively caused Diamond's application for FMLA to be denied;

(v)     The denial of Diamond's FMLA leave under false pretenses occurred just a matter of minutes after Diamond was terminated;

(vi)    Mark Nugent terminated Diamond and instructed her not to come back to work at Athena;

(vii)   Stu Rosenberg told Diamond to come back to work until "application" process for the new job was completed

(viii)  Mark Nugent told Diamond her job would be subject to an open application process;

(ix)    Stu Rosenberg told Diamond her job *was not* subject to open application, but rather was a choice between her and Natalie;

(x)     Athena deviated from normal protocol and did not advertise the availability of Diamond's job in order to obtain a pool of quality applicants;

(xi)    Where Athena did not advertise the availability of Diamond's job, Mark Nugent lied to Diamond when he told her that he interviewed several qualified applicants;

(xii)   Mark Nugent, Stu Rosenberg and Krista Santilli Grace gave Diamond's job to Natalie;

(xiii)  Mark Nugent told Diamond one of the reasons she did not get the job was because they did not like her "appearance;"

(xiv)   The individual defendants as well as Athena tried to escape liability for discriminating against Diamond by coercing her to waive any discrimination claims in exchange for one month's salary.

158.    Based on the conspiracy described above, the whole process of eliminating Diamond's job and interviewing other applicants was merely a pretext to fire Diamond while she was pregnant so she would not burden Athena's unfunded insurance liabilities with her medical bills regarding her pregnancy. At its essence, therefore, the conspiracy by the four (4) individual defendants was acted out in order to cover up for their open discrimination against Diamond.

159.    During the phone call terminating Diamond (again) on December 11, 2024, Mark Nugent stated the best alternate position Athena could offer her would be to work in one of the facilities for $50,000 a year – an effective pay cut of sixty-six percent (66%).

160.    When Diamond replied she was not interested in accepting such a pay cut, Stu Rosenberg stepped in with the subject of the "Release and Separation Agreement." He advised Diamond that *now* the question comes up about her exit from Athena, and he would draft a Release and Separation Agreement in which Diamond would be entitled to four (4) weeks' severance pay.

161.    The Release and Separation Agreement was e-mailed by Stu Rosenberg to Diamond on December 12, 2024, stating: "Good Evening Diamond: Attached please find the draft → per discussion. Please review and we can discuss at your convenience. Thanks. Stu". See unsigned Release and Separation Agreement – Exhibit "F."

162.    The draft of the Release Agreement was between Worcester Rehabilitation and Health Care Center as Employer and Diamond Boone as the Employee.

163.    At ¶ 6 on the second page of the draft Release and Separation Agreement, Diamond was required to release Athena Healthcare Associates, Inc. as well as its subsidiaries, individual officers and directors, from any and all claims arising out of her employment.   In exchange for her four (4) weeks of severance pay, Diamond would have to agree to waive any claims under eighteen (18) specific state and federal employment related statutes, including the FMLA, Title VII and the ADA, as well as the respective Massachusetts counterparts of these federal laws.

164.    On December 17, 2024 at 6:09 P.M., when Diamond did not respond to his e-mail enclosing the Release and Separation Agreement, Stu Rosenberg sent Diamond a text message: "Hi Diamond – I sent the agreement to your private e-mail - please call my cell phone when you get a chance.  Thanks Stu"

165. By e-mail dated December 18, 2024 at 7:55 A.M., Diamond notified Stu Rosenberg "I want to clarify that I will not be signing the Release and Separation Agreement."

166. Stu Rosenberg was devastated when Diamond informed him that she would not sign the Release and Separation Agreement. After all, it was his responsibility to get Diamond's signature on the Release and Separation Agreement. In desperation, Stu Rosenberg pretended he didn't receive the e-mail from Diamond where she declined to sign it.

167. First, Stu Rosenberg sent Diamond a text message dated December 18, 2018 at 10:52 A.M: "Hi Diamond – Please call me on my cell phone (860) XXX-XXXX. Thx Stu."

168. About forty-five (45) minutes later at 11:36 A.M., Stu Rosenberg left Diamond a voicemail message in which he again pretended not to have received her e-mail declining to sign the Release and Separation Agreement:

> Hi Diamond – Stu Rosenberg – I'm just calling to try to wrap up any questions you have – I know you answered a question about EPL which I believe is in that e-mail sandy put together I sent you with the contract – uhm – if you could look at that I think that answers your question about PTL – it all goes in sequence – if we can agree today is your last day then we'll begin – you get paid for last week, you get paid for this week – it all depends on what we're gonna agree is the last day. So, if you can call me I would appreciate it. My cell is 860-463-8811. Thanks

169. On December 18, 2024 at 5:59 P.M. Stu Rosenberg resorted to e-mail "Hi Diamond - Please call me on my cell Re: finalize agreement and plan. In the email when I sent the agreement it explains how we pay PTO severance and notice Pay. Thanks"

170. The next day, December 19, 2024 at 1:48 P.M., when his pretense at ignorance was not working, Stu Rosenberg sent Diamond another e-mail with a "cc" to Mark Nugent RE: Agreement, as follows:

> Of note because you stated you are not planning to sign the Release and Separation Agreement you are not eligible for the 4 weeks (sic) severance at this time. However, as a reminder you have 21 days to re-consider your decision to sign the

Release and Separation Agreement.  Any further questions please feel free to call me on my cell.  Stu.

168.    Diamond never returned to work at Athena.

X.    EVENTS OCCURRING AFTER DIAMOND'S TERMINATION FROM ATHENA

169.    On January 29, 2025 Diamond received a bill in the amount of $16,975 bill for the birth of her third child in November 2023.

170.    The unexpected and sudden receipt of the $16,975 bill caused Diamond extreme emotional distress that was/is magnified by (i) the serious health condition of her pregnancy; (ii) the charade produced by the Defendants as a pretext to terminate her while she was pregnant; and (iii) the knowledge that her $1,200 monthly contribution for health insurance each month was, in essence, stolen by Larry Santilli.

171.    Unlike her three (3) previous pregnancies, Diamond experienced contractions one (1) month earlier than would be experienced in a typical pregnancy.

172.    On the afternoon of April 11, 2025, Diamond gave birth to Baby Doe at St. Joseph's Hospital in Nashua, New Hampshire.

173.    Later that night, Diamond and Burt were woken up by nurses who informed them that Baby Doe had congenital heart failure which was causing a complete lack of blood flow to her lower extremities.

174.    The medical team gave Baby Doe a medication called Prostaglandin E1, the side effect of which is known to be sleep apnea, which caused Baby Boone to stop breathing and turn blue.  Burt thought he had just witnessed his daughter die on the table.

setting forth claims of sex discrimination in violation of M.G.L. c. 151B as well as 42 U.S.C. §2000(e) et. seq. (Title VII).

176.    MCAD assigned MCAD Docket Number: 25BEM00679 to Diamond's MCAD claim.

177.    MCAD assigned EEOC/HUD Docket Number: 16C-2025-01167 to Diamond's claim under Title VII.

178.    On April 8, 2025, MCAD caused Diamond's Complaint to be served on all Defendants with notice that MCAD would conduct an investigation of the facts alleged therein.

179.    On July 13, 2025, Diamond did voluntarily withdraw her MCAD claim No. 25BEM00679 and her Title VII claim No. 16C-2025-01167.

<u>BABY DOE WAS BORN WITH CONGENITAL HEART FAILURE</u>

180.    Unlike her three (3) previous pregnancies, Diamond experienced contractions one (1) month earlier than would be experienced in a typical pregnancy.

181.    For the reasons set forth below, Plaintiffs allege that these early contractions were caused by the severe infliction of emotional distress from the conspiracy to dispossess Diamond of her livelihood.

182.    This severe emotional distress to Diamond was heightened in January 2025 when she received a year old $16,000 invoice for the birth of their third child. This invoice made clear to Diamond that despite having paid about $50,000 in health insurance premiums to Athena, because of the pyramid scheme being perpetrated on her by Larry Santilli, she would soon have to deliver her fourth child with no health insurance whatsoever.

183.    On the afternoon of April 11, 2025, Diamond gave birth to Baby Doe at St. Joseph's Hospital in Nashua, New Hampshire.

184. Later that night, Diamond and Burt were woken up by nurses who informed them that Baby Doe had congenital heart failure which was causing a complete lack of blood flow to her lower extremities.

185. The medical team gave Baby Doe a medication called Prostaglandin E1, which caused Baby Boone to stop breathing and turn blue. Burt thought he had just witnessed his daughter die right before his eyes.

186. Thankfully, Baby Doe did not die on the table.

187. Nonetheless, the nurses at St. Joseph's Hospital informed Burt and Diamond that Baby Doe's condition was life threatening, and she would have to be transported to Children's Hospital in Boston, Massachusetts to receive specialized emergency treatment.

188. The paramedics stabilized Baby Doe and brought her by ambulance to Children's Hospital in Boston.

189. Diamond and Burt followed the ambulance to Boston. This was occurring less than twelve (12) hours after Diamond had given birth to Baby Doe.

190. Approximately twenty-four (24) hours after Baby Doe arrived at Children's Hospital in Boston, the medical team was able to establish blood flow to her lower extremities.

191. For the first several days at Boston Children's Hospital, Baby Doe was in the intensive care unit (ICU), after which she was transferred to the cardiology floor.

192. Baby Doe was at Children's Hospital in Boston for one (1) week total.

193. The medical bill for Baby Doe at Children's Hospital in Boston exceeded $75,000.

36

194.    The injury and trauma to Baby Doe's arterial system while she was in Diamond's womb and after her birth were caused by the severe emotional distress inflicted on Diamond by the concerted actions of Defendants herein, which triggered a sympathetic response resulting in an excess of cortisol.

195.    Respected medical literature describing fetal animal studies conclude that an excess of maternal cortisol will permeate the placenta.

196.    Under conditions of severe emotional distress such as that experienced by Diamond, an excess of maternal cortisol during the latter stages of pregnancy can cause severe disruption of the cardiac conduction system which is a specialized network that initiates and closely coordinates the heartbeat.  The cardiac conduction system development is intricately related to the development and maturation of the embryonic heart towards its four-chambered form, as is indicated by the fact that disturbed development of cardiac structures is often accompanied by a disturbed formation of the cardiac conduction system.  See Jongbloed, Normal and Abnormal Development of the Cardiac Conduction System; Implications for Conduction and Rhythm Disorders in the Child and Adult, Differentiation. 2012 Jul;84(1):131-48. Epub 2012 Jun 3. PMID: 22664174.

197.    Further support for the correlation between the Defendants" discriminatory actions towards Diamond and the prenatal injury to Baby Doe's cardiac construction system is found in Zhao, Prenatal Glucocorticoids Exposure and Adverse Cardiovascular Effects in Offspring Frontiers in Endocrinology (9-16-2024) ("Studies have demonstrated that excessive prenatal GCs [i.e., cortisol] exposure can negatively impact the cardiovascular system of . . . the fetus . . . **particularly in relation to blood pressure**, vascular function, and cardiac development." [Emphasis added].)

198.    As is most relevant to the present case, fetal animal studies have shown under extreme conditions, when an excess of maternal cortisol permeates the placenta at a stage of fetal development when the cardiac conduction system is being formed, excess maternal cortisol is likely to cause a defect in cardiac conduction system that would result in a loss of arterial pressure such as that exhibited by Baby Doe on the date of her birth.  See Antolic, Chronic Maternal Hypercortisolemia In Late Gestation Alters Fetal Cardiac Function at Birth, American Journal of Physiology-Regulatory, Integrative and Comparative Physiology Volume 314, Issue 3 (2017):

> [O]ur prior studies suggest that a modest yet chronic elevation in maternal cortisol concentration throughout late gestation might induce pathophysiological alterations in the late gestation fetal heart and cardiac conduction system. These deleterious changes appeared to become most apparent during the perinatal period, a time in which the fetal heart is normally subject to changes in metabolism, afterload, and ultimately cardiac work (25). **We hypothesized that these effects of elevated maternal cortisol on fetal cardiac metabolism result in altered cardiac conduction that** would be revealed by measurement of fetal ECG and **would have deleterious effects on** fetal heart rate (HR) and **aortic pressure during labor and delivery . . . our results confirm our hypothesis that excess maternal cortisol results in altered cardiac conduction that is revealed as alterations in the fetal ECG and adversely impacts fetal HR and aortic pressure during labor and delivery.** [Emphasis added].

199.    Precisely like the symptoms exhibited by Baby Doe on the night of her birth, the Anatolic article describes how an excess of maternal cortisol can cause a failure of the cardiac construction system which manifests at the time of birth.

200.    The observations and conclusions in the Anatolic article offer a near precise explanation for the injuries suffered by Baby Doe, and thereby establish a strong link between the discriminatory actions of the defendants herein and the injuries suffered by Baby Doe.

## DIAMOND SUFFERED FROM POST-PARTUM DEPRESSION

201.    After the birth of Baby Doe, Diamond was cold and distant.  She had an overwhelming and unexplained sense of sadness, anxiety and emptiness that she had not felt after

the birth of her first three (3) children.  This sense of despair was characterized by significant and sudden changes in her mood as well as sudden bursts of anger.

202.    This emotional state expressed by Diamond after the birth of Baby Doe is in stark contrast to her emotional condition following the birth of each of their first three (3) children.

203.    The emotional state of Diamond after the birth of Baby Doe fits the description of post-partum depression, which is a type of depression that can occur in the first year after having a baby, involving severe and prolonged symptoms of sadness, anxiety, and fatigue.

204.    The symptoms of post-partum depression expressed by Diamond after the birth of Baby Doe are consistent with the findings of a study that concluded the physical effects of severe emotional distress on a mother during pregnancy will increase the chances of the mother suffering from past-partum depression after the child is born.

205.    See Qobadi, The Effect of Stressful Life Events on Postpartum Depression: Findings from the 2009–2011 Mississippi Pregnancy Risk Assessment Monitoring System, Journal of Maternal Child Health, 164–172 (June 23, 2016):

> **Some women can further experience acute highly stressful events during pregnancy, such as the loss of a job** . . . Some women may live with chronic levels of high stress . . . **Previous studies suggest that stressful life events during pregnancy increase the risk of PPD.** [Emphasis added].

<u>COUNT I – VIOLATION OF FMLA UNDER 28 U.S.C. § 1331</u>

206.    The Plaintiffs Diamond Boone, Burton Boone and Baby Doe repeat and incorporate by reference the allegations contained in ¶¶'s 1-206, above.

207.    As      per      an      article      in      the      online      publication "newsfromthestates.com/states/Connecticut" dated November 22, 2024, at the time of the events at issue in this matter, Athena had two thousand five hundred (2,500) employees.

208.    At all times relevant hereto, the size of Athena's workforce did exceed the threshold for jurisdiction of the federal employment regulations under 28 U.S.C. § 1331 (the Family and Medical Leave Act or "FMLA.")

209.    As of October 1, 2024, Diamond Boone was eligible for intermittent FMLA leave for a serious health condition which was her pregnancy.

210.    As of October 1, 2024, Diamond Boone was entitled to the protection of 29 U.S.C. § 2614(a)(1), entitled "Employment and benefits protection – Restoration to position, which states:

>    any eligible employee who takes leave under § 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave, to be (A) restored by the employer to the position of employment held by the employee when the leave commenced or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment

211.    Athena violated 29 U.S.C. § 2614(a)(1) by terminating Diamond (twice) after she had come within the protections afforded by the FMLA. The first termination occurred during the ZOOM call with Mark Nugent and Dennis Billings in the front seat of Diamond's automobile on November 11, 2024.

212.    The second termination came about a month later, when Mark Nugent and Stu Rosenberg informed Diamond she did not get the "new" job, and offered her instead a 66% pay cut, which Diamond declined.

213.    Under 29 U.S.C. § 2615(a)(1), it is unlawful for any employer to interfere with, restrain, or deny the exercise of (or the attempt to exercise), any right provided under the FMLA.

214.    By terminating Diamond in order to prevent her from burdening the depleted Athena employee health care pool with costs for prenatal care and delivery of her child, Athena did interfere with, restrain, or deny Diamond's exercise of or the attempt to exercise, those rights granted her under the FMLA.

215.    Under 29 U.S.C. § 2611(4)(A), liability under the FMLA may attach to any "employer," which includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer."

216.    The interference with, restraint, or denial of the exercise by Diamond of her rights under the FMLA involved the coordinated efforts of Krista Santilli Grace, Mark Nugent, Dennis Billings and Stu Rosenberg who acted directly on behalf of Athena.

217.    By virtue of their authority over Diamond and the use of that authority to cause Diamond to be terminated, each of the individual defendants identified in this Complaint is deemed to have acted as "employer," as such term is used in the FMLA.

### COUNT II – UNLAWFUL EMPLOYMENT PRACTICES
### IN VIOLATION OF 42 U.S.C. § 2000e-2 (TITLE VII)

218.    The Plaintiffs Diamond Boone, Burton Boone and Baby Doe repeat and incorporate by reference the allegations contained in ¶¶'s 1-217, above.

219.    Under 42 U.S.C. 2000e-2(a)(1) (Title VII), it is unlawful for an employer . . . to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." This prohibition against employer sex discrimination under Title VII includes discrimination because of pregnancy.

220.    Under 42 U.S.C. § 2000gg-1(1), it is an unlawful employment practice for a covered entity to not make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee such as Diamond.

221.    The refusal of Krista Santilli Grace to grant Diamond the reasonable accommodations she requested due to the adverse health impact of driving long distances constitutes a violation of Athena's obligations under 42 U.S.C. § 2000gg-1(1).

222.    Under 42 U.S.C. § 2000gg-1(2), it is an unlawful employment practice for a covered entity to require a qualified employee affected by pregnancy, childbirth, or related medical conditions such as Diamond to accept an accommodation other than any reasonable accommodation arrived at through the interactive process referred to in section 2000gg.

223.    The refusal of Krista Santilli Grace to grant Diamond the reasonable accommodations she requested due to the adverse health impact of driving long distances constitutes a violation of Athena's obligations under 42 U.S.C. § 2000gg-1(2).

224.    Under Title VII at 42 U.S.C. § 2000gg-2, "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of such individual having exercised or enjoyed . . . any right granted or protected by this chapter."

225.    As described herein, Athena terminated Diamond's employment because she became pregnant and would therefore cause Athena to incur significant unfunded medical liability.

226.    Because Athena terminated Diamond as a result of her pregnancy, Athena violated the prohibition against pregnancy discrimination contained in 42 U.S.C. § 2000gg-2.

227.    Because Diamond filed a claim with the EEOC, which claim was subject to investigation by MCAD and which she voluntarily withdrew, Diamond did properly exhaust her administrative remedies under Title VII prior to the filing of this Complaint.

228.    COUNT III – VIOLATION OF 29 U.S.C. §1001, ET. SEQ. (ERISA)

229.    The Plaintiffs Diamond Boone, Burton Boone and Baby Doe repeat and incorporate by reference the allegations contained in ¶¶'s 1-227, above.

230.    The conversion by Larry Santilli of the more than $1,200 contributed by Diamond each month to Athena's Employee Health Insurance Plan constitutes a violation

of federal criminal law at 18 U.S. Code § 664 - <u>Theft or embezzlement from employee</u>
<u>benefit Employee Health Insurance Plan</u>, which states:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts
> to his own use or to the use of another . . . any employee welfare benefit plan or
> employee pension benefit plan, or of any fund connected therewith, shall be fined
> under this title, or imprisoned not more than five years, or both.

### COUNT V – VIOLATION OF M.G.L. c. 151B FOR SEX DISCRIMINATION

231.    The Plaintiffs Diamond Boone, Burton Boone and Baby Doe repeat and incorporate
by reference the allegations contained in ¶¶'s 1-230, above.

232.    Under M.G.L. c. 151B, § 4(4)(1) it is unlawful: "For an employer, by himself or
his agent, because of the . . . pregnancy or a condition related to said pregnancy . . . to discharge
from employment such individual . . . unless based upon a bona fide occupational qualification."

233.    As described herein, Athena terminated Diamond's employment because she
became pregnant and would therefore cause Athena to incur significant unfunded medical liability.

234.    Because Diamond's pregnancy would impose significant unfunded medical costs
on Athena, the individual defendants - Krista Santilli Grace, Mark Nugent, Dennis Billings and
Stu Rosenberg – were motivated by discriminatory animus to: (i) terminate Diamond before she
could impose the medical costs of her pregnancy on Athena; and (ii) coerce Diamond to sign the
Release and Separation Agreement releasing them from liability for their discrimination.

235.    As a result of the clear intent of Krista Santilli Grace, Mark Nugent, Dennis Billings
and Stu Rosenberg to discriminate against Diamond because she was pregnant, these individuals
may be held personally liable for the violations of M.G.L. c. 151B described herein. See MCAD's
decision in <u>Woodason v. Town of Norton School Committee</u>, 25 MDLR 62 (2003) which states

that an "individual employee may be held liable if found to act in deliberate disregard of complainant's rights sufficient to give rise to an inference of an intent to discriminate."

236.    Because Athena terminated Diamond as a result of her pregnancy, Athena violated M.G.L. c. 151B, § 4(4)(1).

237.    Because Athena terminated Diamond as a result of her pregnancy and Krista Santilli Grace, Mark Nugent, Dennis Billings and Stu Rosenberg participated in that termination with discriminatory intent, these individuals also violated M.G.L. c. 151B, § 4(4)(1).

238.    Under M.G.L. c. 151B, § 4(A), it is unlawful: "For any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by M.G.L. c. 151B."

239.    Because Athena terminated Diamond as a result of her pregnancy, Athena violated M.G.L. c. 151B, § 4(A).

240.    Because Athena terminated Diamond as a result of her pregnancy and Krista Santilli Grace, Mark Nugent, Dennis Billings and Stu Rosenberg participated in that termination with discriminatory intent, these individuals also violated M.G.L. c. 151B, § 4(A).

241.    Under M.G.L. c. 151B § 4(5), it is unlawful: "For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so."

242.    Because Athena terminated Diamond as a result of her pregnancy and Krista Santilli Grace, Mark Nugent, Dennis Billings and Stu Rosenberg did "aid, abet, incite, compel or coerce the doing of" that termination, these individuals also violated M.G.L. c. 151B, § 4(5).

243.    Under M.G.L. c. 151B:4.1E(a), it shall be an unlawful practice "For an employer to deny a reasonable accommodation for an employee's pregnancy or any condition related to the employee's pregnancy."

244.    The denial by Krista Santilli Grace of Diamond's request for reasonable accommodations associated with her pregnancy constitutes a violation of M.G.L. c. 151B:4.1E(a), which, because of her intent to discriminate, renders her individually liable for such violation.

245.    Athena violated 29 U.S.C. § 2614(a)(1) by terminating Diamond (twice) after she had come within the protections afforded by the FMLA. The first termination occurred during the ZOOM call with Mark Nugent and Dennis Billings in the front seat of Diamond's automobile on November 11, 2024.

246.    The second termination came about a month later, when Mark Nugent and Stu Rosenberg informed Diamond she did not get the "new" job, and offered her instead a 66% pay cut, which Diamond declined.

247.    Under 29 U.S.C. § 2615(a)(1), it is unlawful for any employer to interfere with, restrain, or deny the exercise of (or the attempt to exercise), any right provided under the FMLA.

248.    By terminating Diamond in order to prevent her from burdening the depleted Athena employee health care pool with costs for prenatal care and delivery of her child, Athena did interfere with, restrain, or deny Diamond's exercise of or the attempt to exercise, those rights granted her under the FMLA.

249.    Under 29 U.S.C. § 2611(4)(A), liability under the FMLA may attach to any "employer," which includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer."

250.    The interference with, restraint, or denial of the exercise by Diamond of her rights under the FMLA involved the coordinated efforts of Krista Santilli Grace, Mark Nugent, Dennis Billings and Stu Rosenberg who acted directly on behalf of Athena.

251.    By virtue of their authority over Diamond and the use of that authority to cause Diamond to be terminated, each of the individual defendants identified in this Complaint is deemed to have acted as "employer," as such term is used in the ma FMLA.

### COUNT VI – VIOLATION OF M.G.L. c. 175M, § 1 ET. SEQ.
### [THE MASSACHUSETTS FAMILY & MEDICAL LEAVE ACT (MASS. FMLA)]

252.    The Plaintiffs Diamond Boone, Burton Boone and Baby Doe repeat and incorporate by reference the allegations contained in ¶¶'s 1-251, above.

253.    Similar to its federal counterpart, the Massachusetts FMLA at M.G.L. c. 175M, § 9(a) states as follows:

> It shall be unlawful for any employer to retaliate by discharging, firing, suspending, expelling, disciplining, through the application of attendance policies or otherwise, threatening or in any other manner discriminating against an employee for exercising any right to which such employee is entitled under this chapter or with the purpose of interfering with the exercise of any right to which such employee is entitled under this chapter.

254.    Athena violated M.G.L. c. 175M, § 9(a) by terminating Diamond (twice) after she had come within the protections afforded by the FMLA. The first termination occurred during the ZOOM call with Mark Nugent and Dennis Billings in the front seat of Diamond's automobile on November 11, 2024.

255.    The second termination came about a month later, when Mark Nugent and Stu Rosenberg informed Diamond she did not get the "new" job, and offered her instead a 66% pay cut, which Diamond declined.

46

256.    Under M.G.L. c. 175M, § 9(a), it is unlawful for any employer to interfere with, restrain, or deny the exercise of (or the attempt to exercise), any right provided under the Massachusetts FMLA.

257.    By terminating Diamond in order to prevent her from burdening the depleted Athena employee health care pool with costs for prenatal care and delivery of her child, Athena did interfere with, restrain, or deny Diamond's exercise of or the attempt to exercise, those rights granted her under the Massachusetts FMLA.

258.    Under M.G.L. c. 175M, § 9(a), liability under the FMLA may attach to any "employer," which includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer."

259.    The interference with, restraint, or denial of the exercise by Diamond of her rights under the Massachusetts FMLA involved the coordinated efforts of Krista Santilli Grace, Mark Nugent, Dennis Billings and Stu Rosenberg who acted directly on behalf of Athena.

260.    By virtue of their authority over Diamond and the use of that authority to cause Diamond to be terminated, each of the individual defendants identified in this Complaint is deemed to have acted as "employer," as such term is used in the Massachusetts FMLA.

261.    As a result of the actions of both Athena and the individual Defendants herein in violation of the FMLA, the Plaintiffs have suffered damages.

## COUNT IV – INTENTIONAL AND/OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS

262.    The Plaintiffs Diamond Boone, Burton Boone and Baby Doe repeat and incorporate by reference the allegations contained in ¶¶'s 1-261, above.

263.    In their respective capacities as (i) corporate employer; and (ii) individuals possessing supervisory authority over Diamond, the Defendants owed Diamond a duty of due care to act lawfully with respect to her rights as an employee of Athena.

264.    At the moment when Diamond notified Defendants that she was pregnant, the duty owed by Defendants to Diamond was also owed under a separate duty of care to Baby Boone.

265.    Having assumed a duty of care towards Baby Boone, it was reasonably foreseeable to Defendants that given the severe emotional distress that they were intentionally causing to Diamond, their actions made it more likely that Baby Boone's fetal development would be adversely affected.

266.    Being aware that their actions increased the likelihood that Baby Boone would suffer a fetal injury, the Defendants were thus aware that in the event that Baby Boone did in fact suffer a significant fetal injury, that not only Diamond would suffer severe emotional distress as a result, but that Burton would suffer severe emotional distress, as well.

267.    Acting on behalf of Athena, the Defendants coordinated the simultaneous termination of Diamond's employment with the denial of her FMLA rights.

268.    The actions of the individual Defendants who terminated Diamond from her employment at a time when she was pregnant and therefore most vulnerable to financial coercion was made with the specific intent to cause her extreme emotional distress and discomfort in order to coerce her to sign the Separation and Release Agreement.

269.    The actions of the Defendants in firing Diamond while she was pregnant, concocting a charade to deceive her into signing a release and then steal her health insurance premiums - were extreme and outrageous.

270.    As a result of the Defendants' extreme and outrageous conduct described herein, the Plaintiffs Burton Boone, Diamond Boone and Baby Doe have suffered injury.

COUNT XII - LOSS OF CONSORTIUM UNDER N.H. STATUTE § 507:8-A

271.    The Plaintiffs Diamond Boone, Burton Boone and Baby Doe repeat and incorporate by reference the allegations contained in ¶¶'s 1-270, above.

272.    As a result of the discriminatory actions by Defendants against Diamond described herein, the post-partum depression suffered by Diamond after the birth of Baby Boone has caused Burton to suffer the loss of Diamond's companionship as well as the loss of her affection.

273.    Under N.H. Statute § 507:8-A, where parties such as the Defendants have caused injury to one spouse, which injury causes the other spouse to lose the companionship and affection of the injured spouse, the non-injured spouse has the right to recover such loss from Defendants.

COUNT XIII – PRE-NATAL INJURY CAUSED TO BABY BOONE'S CARDIAC<br>CONSTRUCTION SYSTEM BY DEFENDANTS' DISCRIMINATORY ACTS

274.    The Plaintiffs Diamond Boone, Burton Boone and Baby Doe repeat and incorporate by reference the allegations contained in ¶¶'s 1-273, above.

275.    As either the employer of Diamond at Athena or as a supervisor of Diamond in her employment at Athena, from the moment when Baby Doe was first conceived and in Diamond's womb, each of the Defendants owed Baby Doe a duty of care.

276.    As a result of the discriminatory actions by Defendants against Diamond described herein, Diamond did suffer severe emotional distress.

277.    Because of the severe emotional distress suffered by Diamond as a result of the discriminatory actions herein, Baby Doe did suffer a severe cardiac injury at the moment when she was born.

WHEREFORE, THE PLAINTIFFS DIAMOND BOONE, BURTON BOONE AND BABY DOE BOONE RESPECTFULLY REQUEST THAT THIS MATTER BE TRIED BEFORE A JURY ON ALL COUNTS OF THIS VERIFIED COMPLAINT SO TRIABLE.

Respectfully submitted,

By the Plaintiff,
Diamond Boone

Diamond Boone

Date: 12/8/2025

By the Plaintiff,
Burton Boone, III

Burton Boone III          Date: 12/8/2025

Baby Doe Boone    BB    12/8/2025

50